78 N.Y.2d 711 (1991)
The People of the State of New York, Respondent,
v.
Charles Patterson, Appellant.
Court of Appeals of the State of New York.
Argued September 11, 1991.
Decided November 21, 1991.
Robert H. Kirchner for appellant.
Robert E. Wildridge, District Attorney (Victoria Anthony and Lisa Sapino of counsel), for respondent.
Andrew C. Fine for The Legal Aid Society and another, amici curiae.
Chief Judge WACHTLER and Judges SIMONS and BELLACOSA concur with Judge ALEXANDER; Judge TITONE dissents and votes to reverse in a separate opinion in which Judge KAYE concurs; Judge HANCOCK, JR., taking no part.
*713 ALEXANDER, J.
On this appeal we consider the question of whether suppression of in-court identification testimony is required where there has been a violation of CPL 160.50, to wit: the failure to return defendant's photograph taken in connection with an unrelated charge which was dismissed and the file ordered sealed, and the subsequent use of that photograph in an identification procedure in relation to defendant's prosecution in the instant proceeding. We conclude that suppression is not required.
On April 2, 1986, upon viewing a photographic array containing a photograph of defendant, complainant Michael Hagenbach identified defendant as one of the persons who assaulted and robbed him. That photograph had been taken at the time of defendant's arrest in early 1986 in connection with an unrelated matter which had been dismissed without prejudice and the case file ordered sealed pursuant to CPL 160.50.[1] Despite that sealing order, some two months later the police used the photograph in the array which Hagenbach viewed. Defendant's ensuing motion to suppress any in-court identification testimony was denied by the trial court because it concluded that the identification procedure was not tainted by the use of the subject photograph in the photo array. The Appellate Division affirmed defendant's conviction of second *714 degree robbery, holding that use in a photo array of defendant's photograph retained in violation of CPL 160.50 does not require per se suppression of in-court identification testimony. Leave to appeal was granted by a Judge of this Court.
Defendant argues that the use of his photograph in violation of CPL 160.50 implicated substantial constitutional rights and tainted the identification procedure such as to warrant suppression of any in-court identification testimony by Hagenbach. He argues further that the trial evidence was legally insufficient to support his conviction for robbery. We disagree. Although CPL 160.50 was violated, that violation did not infringe upon any constitutional right of the defendant sufficient to warrant invocation of the exclusionary rule. Furthermore, the trial evidence was sufficient to sustain defendant's conviction of the crime of robbery.

I
The photograph used in the photo array in this case was obtained from a criminal file which had been ordered sealed some two months earlier. Thus, defendant was entitled to have the photograph returned to him; its retention by the police and use in the photo array violated CPL 160.50. While we find no authorization in that statute for the use in a law enforcement agency's investigatory procedures of a photograph retained in violation thereof (cf., People v Dozier, 131 AD2d 587, lv denied 70 N.Y.2d 711; People v London, 124 AD2d 254, lv denied 68 N.Y.2d 1001), a statutory violation such as this does not warrant suppression of the identification testimony.
Defendant does not allege that the identification procedure was conducted under impermissible circumstances; he argues only that the use of the challenged photograph was improper and requires suppression. Moreover, he makes no claim that the taking of the photograph originally was in any way illegal. Thus, he does not challenge the reliability of the identification process, as indeed he could not inasmuch as the reliability of that process was unaffected by the use of the photograph. Finally, the violation of the statute does not in any way affect the proceedings to determine defendant's guilt or innocence of the crimes charged.
Defendant argues, however, and our dissenting colleagues agree, that although no Fourth or Fifth Amendment right is at issue in this case, suppression is nevertheless mandated in *715 order to protect a "substantial right" conferred by CPL 160.50 and to further the underlying purposes of the exclusionary rule. Defendant and the dissent argue that the statute creates a "substantial right" that "relate[s] rather closely" to Fourth Amendment protections. However, a review of the legislative history of CPL 160.50 and related statutes enacted at the same time lead inevitably to the conclusion that the nature of that statutory remedy is unrelated to any Fourth or Fifth Amendment protections. Nor is there any indication that the use of a photograph retained in violation of CPL 160.50 should require suppression in an independent criminal proceeding of otherwise reliable, admissible identification evidence.
A defendant has no inherent or constitutional right to the return of photographs, fingerprints or other indicia of arrest where charges are dismissed (see, Matter of Molineux v Collins, 177 N.Y. 395; see also, People v Anderson, 97 Misc 2d 408, 411). In New York, this entitlement to the return of such items is statutorily conferred by CPL 160.50, which became effective in September of 1976 (L 1976, ch 877, as amended by L 1977, chs 835, 905). That statute (CPL 160.50), along with CPL 160.60 and Executive Law § 296 (14) (now § 296 [16]) (both of which were enacted at the same time as, and cross-reference CPL 160.50), was enacted as part of an over-all legislative package designed "to protect the rights of individuals against whom criminal charges have been brought, but which did not ultimately result in a conviction" (Governor's Approval Mem in Support of S 9924-A, 1976 McKinney's Session Laws of NY, at 2451).
In addition to creating a right to the return of a defendant's photographs, fingerprints and palmprints, the Legislature made it an unlawful discriminatory practice under Executive Law § 296, except in specified cases, for any person or agency to inquire into or take adverse action in connection with the licensing, employment or providing of credit or insurance to an individual in regard to a favorably terminated criminal action (Executive Law § 296 [16]). Further, in order to restore accuseds "in contemplation of law, to the status [they] occupied before the arrest and prosecution," CPL 160.60 provides that a favorably terminated criminal prosecution shall not operate as a disqualification "of any person so accused to pursue or engage in any lawful activity, occupation, profession, or calling," and prohibits inquiry into such prosecution, except where authorized by statute or a court (see, People v Gallina, 110 AD2d 847; *716 People v Anderson, 97 Misc 2d 408, 412, supra).
The legislative history of CPL 160.50 does not at all support an intent on the part of the Legislature to create a constitutionally derived right. Rather, the Legislature's objective in enacting CPL 160.50 and the related statutes concerning the rights of exonerated accuseds was to ensure that the protections provided be "consistent with the presumption of innocence, which simply means that no individual should suffer adverse consequences merely on the basis of an accusation, unless the charges were ultimately sustained in a court of law" (Governor's Approval Mem, 1976 McKinney's Session Laws of NY, at 2451). Indeed, the over-all scheme of the enactments demonstrates that the legislative objective was to remove any "stigma" flowing from an accusation of criminal conduct terminated in favor of the accused, thereby affording protection (i.e., the presumption of innocence) to such accused in the pursuit of employment, education, professional licensing and insurance opportunities (see, People v Anderson, 97 Misc 2d 408, supra).
Consistent with this objective, the Legislature established procedures, under article 15 of the Executive Law, for the filing and determination of complaints relating to unlawful discriminatory practices based on a previously terminated criminal action (Executive Law § 296 [16]; § 297 et seq.; see also, Anderson v City of New York, 611 F Supp 481 [violation of CPL 160.50 supports 42 USC § 1983 action]). These provisions support the view that the Legislature intended to provide a civil remedy for violation of the provisions of CPL 160.50. Contrary to defendant's assertions, there is nothing in the history of CPL 160.50 or related statutes indicating a legislative intent to confer a constitutionally derived "substantial right", such that the violation of that statute, without more, would justify invocation of the exclusionary rule with respect to subsequent independent and unrelated criminal proceedings. Consequently, we conclude that although the statutorily conferred right to the return of one's photograph serves important purposes and protects important interests, the infringement of that right does not implicate constitutional considerations such as to require the sanction of suppression.
As the dissent notes, we have, in limited circumstances, *717 held that the violation of a statute may warrant imposing the sanction of suppression. However, we have done so only where a constitutionally protected right was implicated, a circumstance not here present (see, e.g., People v Taylor, 73 N.Y.2d 683; People v Gallina, 66 N.Y.2d 52; People v Moselle, 57 N.Y.2d 97). For instance, in Taylor (supra), where there was a failure to comply with the provisions of CPL 690.40 (1), requiring the court to record or summarize on the record an examination made in determining an application for a search warrant, we found suppression appropriate because fundamental Fourth Amendment rights were implicated. We concluded that compliance with the statute was "indispensable to the determination whether the constitutional requirements for a valid search and seizure have been met" (People v Taylor, id., at 690). Similarly, in Gallina (supra), suppression was required where certain wiretap evidence was obtained pursuant to a warrant whose issuance depended on information obtained from a prior wiretap illegally procured in violation of the extension and inactivation requirements of CPL article 700. In Moselle (supra), a constitutionally protected interest was clearly implicated where blood tests were administered without the defendant's consent or court order in violation of subdivisions (1) and (2) of former section 1194 of the Vehicle and Traffic Law and CPL 240.40.
In each of these instances, the statutory imperative operates directly to protect and preserve a constitutionally guaranteed right of the citizen. By contrast, the right conferred by CPL 160.50 to have one's photographs returned does not implicate fundamental constitutional interests or considerations.
Moreover, while we have held that an individual's right to due process is violated by improper access to records sealed pursuant to CPL 160.50 (Matter of Dondi, 63 N.Y.2d 331, 339), we noted that such violation "in itself will not necessarily justify a dismissal of the complaint," and concluded that dismissal of the complaint therein was warranted because of the existence of other significant factors, in addition to the statutory violation. To require the remedy of suppression for a violation of CPL 160.50, without more, would impermissibly expand the exclusionary rule, and would be inappropriate, particularly where, as here, the violation had no bearing on the reliability of the identification process and no relevance to *718 the determination of defendant's guilt or innocence at his trial.[2]
The trial court found that the photographic array procedure utilized by the police "was conducted in a lawful manner and was in no way impermissively [sic] suggestive so as to constitute a violation of defendant's constitutional rights." Indeed, no claim to the contrary has been raised. Thus, inasmuch as it does not appear that the in-court identification testimony was obtained under circumstances inconsistent with any constitutional rights of the defendant, the technical violation of CPL 160.50 does not warrant suppression of the identification testimony.

II
Defendant's contention that the evidence was legally insufficient to sustain his conviction for robbery in the second degree is without merit. The Appellate Division found, upon its factual review, that the trial evidence was legally sufficient to sustain defendant's conviction for robbery in the second degree. We agree. Viewing that evidence in the light most favorable to the People (see, People v Contes, 60 N.Y.2d 620), we conclude that it provided a sufficient basis upon which the jury could rationally conclude that defendant and his codefendant forcibly deprived Hagenbach of the use of his truck and caused him physical injury (see, Penal Law § 160.10 [2] [a]).
Accordingly, the order of the Appellate Division should be affirmed.
TITONE, J. (dissenting).
The majority asserts, conclusorily, that the elements of a robbery were established, and the Court further holds that the police's use of a photograph that should have been sealed to obtain an identification of defendant did not give rise to reversible error. Inasmuch as the former conclusion is not supported by the record and the latter conclusion is inconsistent with sound policy and precedent, we dissent.
Since the underlying facts are not apparent from the majority's *719 opinion, a summary of the background and the People's evidence is necessary. According to the victim, Michael Hagenbach, he first encountered defendant and the codefendant, Gordon Thompson, on the evening of March 29, 1986, while driving away from his friend's home in the City of Syracuse. Hagenbach spoke briefly with defendant and Thompson about going out with them to drink some beer.[*] Suddenly, Thompson jumped into Hagenbach's truck and pushed Hagenbach into the passenger seat while defendant entered on the driver's side and drove the truck to the Onondaga Indian Reservation, where Thompson and defendant, as well as Hagenbach's present girlfriend Arlette Thomas, resided. Hagenbach thought it was "all a big joke" and, consequently, was not frightened. The three men drank beer outside Arlette Thomas's home, with several others, for a while. Hagenbach then returned to his vehicle and continued to drink alone.
At some point, Thompson entered Hagenbach's truck and, without provocation, grabbed him around the neck. Defendant and Thompson punched him and threw him on the ground, taking his wallet and demanding money and the keys to his truck. Hagenbach, however, had stuffed the keys down into the truck seat during the earlier part of the struggle. His assailants released him when he promised that he would retrieve the keys, but he instead immediately ran into the woods.
Hagenbach emerged from the woods early the next morning when he thought that no one was around. When he got into his truck and tried to find his keys, he noticed that the dashboard had been damaged and that the ignition and speakers had been torn out. While he was trying to start the truck by "hot wiring" it, Hagenbach saw Thompson and defendant come toward him. They first tried unsuccessfully to persuade Hagenbach to come out of the truck. Hagenbach finally emerged from the truck when the two men threatened him with an axe. According to Hagenbach, defendant and Thompson punched him and hit him with the blunt part of an axe, saying "[t]his is what a white boy gets for being on the Onondaga Reservation."
Hagenbach eventually fell into unconsciousness. He was beginning to revive when he heard defendant and Thompson telling a third person who had approached in a three-wheeled *720 vehicle that there had been an accident. Hagenbach took this opportunity to flee to a nearby house, where he telephoned for help. Hagenbach was taken to the hospital for treatment. The police subsequently found his truck outside Arlette Thomas's house.
At the trial, defendant took the position that Hagenbach was mistaken in his identification of him and that the second assailant was, in fact, defendant's younger cousin Brian Patterson. According to defendant, he had been drinking with his younger cousin, Brian Patterson, and several others most of the day, until Brian passed out. Hagenbach arrived at the reservation at about 7:00 P.M. with a case of beer in the back of the truck. Some time shortly thereafter, defendant, who was drunk and tired, went into the house to find Ilene Thomas, his girlfriend, and then went to sleep.
Both the codefendant, Thompson, and Brian Patterson gave testimony that supported the defense theory. Thompson testified that defendant had gone to bed shortly after Hagenbach had arrived at the reservation. Thompson, who did not like Hagenbach, told him to leave and, when Hagenbach could not get his truck started, told him to go to a gas station. Thompson then drank some beer and went to sleep. He awoke to the sound of Hagenbach trying to start his truck. He and defendant's cousin Brian Patterson went outside and became embroiled in a fist fight with Hagenbach after the latter used racial epithets. According to Thompson, Hagenbach ran away as a three-wheeled vehicle approached. Brian Patterson gave substantially the same account of events.
On the basis of this evidence, the jury acquitted defendant of all the indictment counts that were submitted in connection with the events that occurred on the evening of March 29, 1986. He was convicted of only one crime, second degree robbery (Penal Law § 160.10 [2]), which, as charged to the jury, required the People to prove that on March 30, 1986 he and Thompson forcibly stole Hagenbach's truck. Notably, the court had instructed the jury that it should consider the events of March 29th and March 30th to be two separate incidents. Following the Appellate Division's affirmance of his conviction, defendant appealed to this Court.

I.
The majority concludes that the trial evidence was legally sufficient to sustain the robbery count of which defendant was *721 convicted, but, apart from an unadorned assertion that the trial evidence "provided a sufficient basis" for the conviction, the majority has not troubled to identify either the evidence supporting the robbery charge or a viable theoretical basis for finding the defendants guilty of that crime. Certainly, an affirmance cannot be based on the premise that defendant stole Hagenbach's truck by damaging it and thereby reducing its value, since, as the trial court stated, defendants were "simply not charged with" damaging the truck and such a theory was "not part of the case." Yet, if this theory is subtracted, there is little, if any, other ground to support the essential theft element of the robbery charge (see, Penal Law § 160.00 ["(r)obbery is forcible stealing"]), since no "taking" of the truck was proven.
A person steals property "when, with intent to deprive another of property or to appropriate the same to himself * * * he wrongfully takes, obtains or withholds such property from an owner thereof" (Penal Law § 155.05 [1]). At a minimum, the underscored element of larceny and robbery requires a showing that "the thief exercised dominion and control over the property for a period of time, however temporary, in a manner wholly inconsistent with the owner's continued rights" (People v Jennings, 69 N.Y.2d 103, 118). While actual "asportation" of the property need not be proven in a case involving the alleged theft of a vehicle, there must be some proprietary act taken by the accused in connection with the property to establish a taking. Thus, in People v Alamo (34 N.Y.2d 453, 455-458), the Court concluded that the thief had sufficiently "taken command" of the vehicle when he entered it, closed the door, turned the lights on and started it before he was intercepted by the police. Similarly, in People v Robinson (60 N.Y.2d 982), the Court held that a "taking" of the parts of a car was complete when the car itself, with its parts, was removed from its owner's premises, even though the parts may not yet have been severed from the vehicle. Here, in contrast, there is absolutely no evidence that defendant or Thompson exercised any "dominion and control" whatsoever over Hagenbach's truck on the morning of March 30th.
According to Hagenbach's version of events, defendant and Thompson accosted him as he was trying to start his truck, threatened him with an axe until he stepped outside and then beat him into unconsciousness. By his own admission, Hagenbach ran away when he revived and saw an opportunity to escape, thereby abandoning the truck. Nothing in the otherwise *722 reprehensible conduct described by Hagenbach even remotely suggests an attempt by the two assailants to take control of the truck. Indeed, the only movements that either of the assailants made in the direction of the truck were the menacing gestures appellant allegedly made with the axe. As is evident from Hagenbach's own statements, however, these gestures were, if anything, calculated to gain "dominion and control" over Hagenbach's person, not his truck.
Furthermore, there was no evidence of any efforts by defendant or Thompson to take control of the truck after Hagenbach ran away and left it behind. To the contrary, when the authorities went to the reservation to investigate, they found the truck in Thomas's yard, where Hagenbach had left it. Defendant's inaction when he had every opportunity to take control of and appropriate the truck to himself belies any serious argument that he was acting with larcenous intent. In sum, while the accuseds' conduct on the preceding evening might have supported an attempted robbery charge, the evidence did not support the charge of which they were convicted, i.e., robbing Hagenbach of his truck on the morning of March 30, 1986. Accordingly, the judgment should have been reversed and the indictment dismissed.

II.
Even if there were evidentiary support for the second degree robbery charge, there would still have to be reversal and a retrial because of the manner in which the police initially obtained an identification from Hagenbach through the use of a photograph from a prior arrest, which should have been returned to defendant pursuant to an order issued under CPL 160.50. In upholding defendant's conviction despite this gross violation of law, the majority has explicitly rejected the People's primary contention, i.e., that CPL 160.50 was not intended to preclude the "investigative use" of sealed records and photographs, and has instead held that the police's retention and use of defendant's photograph violated the statute (see, majority opn, at 714; see also, Matter of Alonzo M. v New York City Dept. of Probation, 72 N.Y.2d 662). Nonetheless, despite its rejection of the People's main argument, the majority holds that no remedy for the wrong is required. Its analysis is unconvincing.
The majority begins with the unobjectionable, but irrelevant, observations that the photograph was not initially obtained *723 in an illegal manner, that the reliability of Hagenbach's identification of defendant's photograph is not challenged and that the violation of CPL 160.50 did not impair the truth-seeking process (majority opn, at 714; see also, majority opn, at 718). The majority also stresses, again without apparent relevance, that the statutory violation occurred in a criminal proceeding that was unrelated to the earlier criminal proceeding in connection with which the photograph was originally obtained (majority opn, at 713, 715). Having thus disposed of several "straw men" of its own invention, the majority then turns to the only salient question presented: whether the right conferred by CPL 160.50 is so substantial and so closely related to identifiable constitutional guarantees that the remedy of suppression should be invoked as a means of redressing violations.
On this question, the determinative legal principles are clear. This Court only recently held that suppression is an appropriate remedy for a statutory violation when the violated statute's purpose is to implement a constitutional guarantee (People v Taylor, 73 N.Y.2d 683). While insubstantial violations of procedural statutes or violations of statutes that are unrelated to constitutional goals need not lead to suppression (see, e.g., People v Silverstein, 74 N.Y.2d 768, cert denied 493 US 1019; People v Harris, 48 N.Y.2d 208, 216; People v Payton, 45 N.Y.2d 300, 314-315, revd on other grounds 445 US 573; Matter of Emilio M., 37 N.Y.2d 173), we have not hesitated to suppress for nonconstitutional statutory wrongs where important privacy interests of citizens were implicated (see, e.g., People v Taylor, supra; People v Gallina, 66 N.Y.2d 52; People v Moselle, 57 N.Y.2d 97, 109). Moreover, it has been recognized that the exclusionary rule may fairly be invoked to remedy statutory violations "when the provision in question confers a substantial right, especially if it is one which can be said to relate rather closely to Fourth Amendment protections" (1 La Fave and Israel, Criminal Procedure § 3.1 [e], at 146; see also, People v Dyla, 142 AD2d 423, 438-439 [suggesting distinction between statutes which are designed to protect substantial privacy interests and statutes which are not]; Dix, Exclusionary Rule Issues as Matters of State Law, 11 Am J Crim L 109, 133). Another obvious consideration in deciding whether to apply the exclusionary rule is the value of and need for that remedy as a means of enforcing the statutory prohibition.
When viewed in light of these criteria, the majority's refusal *724 to invoke the suppression remedy in this context reflects an overly restrictive application of the law. Although the majority insists that CPL 160.50 was not designed "to create a constitutionally derived right" (majority opn, at 716), its assertion is belied by its own acknowledgment that the statute was specifically designed to protect the constitutionally derived presumption of innocence by ensuring that "one who is charged but not convicted of an offense suffers no stigma as a result of his having once been the object of an unsustained accusation" (Matter of Hynes v Karassik, 47 N.Y.2d 659, 662-663; accord, Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d, at 668, supra; Governor's Approval Mem, 1976 McKinney's Session Laws of NY, at 2451; Bill Jacket, L 1976, ch 877, Sponsors' Mem in Support of S 9924-A [per Senator Pisani and Assemblymen Fink and Blumenthal], at 2 [bill "would make presumption of innocence more of a reality"]; see, majority opn, at 716). Further, although the majority describes the gist of this Court's recent decisions invoking the exclusionary rule for statutory violations that "implicate" constitutional rights (majority opn, at 716-717), it never explains why, in contrast to the result in those cases, the constitutional presumption of innocence that CPL 160.50 "implicates" is not similarly deserving of the protection afforded by the remedy of suppression. Instead, it merely asserts, in conclusory fashion, that the rights conferred by CPL 160.50 do not "implicate fundamental constitutional interests or considerations" (majority opn, at 717) and are not "such as to require the sanction of suppression" (majority opn, at 716). Certainly, the conclusion of the Court in Matter of Dondi (63 N.Y.2d 331, 339 [emphasis supplied]) that a violation of CPL 160.50 "in itself will not necessarily justify a dismissal of the complaint [in an attorney disciplinary proceeding]" has no analytical bearing on the entirely separate question of whether the lesser remedy of suppression is appropriate. Thus, the majority's unexplained reference to the Dondi opinion is, at best, unconvincing.
The majority's refusal to accord legal significance to the constitutional considerations that underlie the statute is particularly surprising, since it is plain that the statutory requirement of confidentiality also implicates the Fourth Amendment to the United States Constitution. Even without a statute like CPL 160.50 mandating sealing of records and return of photographs, courts of other jurisdictions have held that, under some circumstances, expungement of police records following the dismissal of the charges may be required *725 as a means of effectuating the constitutional rights to privacy, as well as the presumption of innocence (Utz v Cullinane, 520 F.2d 467, 478-483; Davidson v Dill, 180 Colo 123, 503 P2d 157; see also, Matter of Henry v Looney, 65 Misc 2d 759 [Wachtler, then J.]; see generally, Leedom, Removing the Stigma of Arrest: The Courts, The Legislatures and Unconvicted Arrestees, 47 Wash L Rev 659; Comment, Maintenance and Dissemination of Criminal Records: A Legislative Proposal, 19 UCLA L Rev 654, 657-664). Further, in Anderson v City of New York (611 F Supp 481), which the majority has itself cited, the court thrice recognized that CPL 160.50 was designed to protect "reputation and privacy interests by controlling the physical location of the photographs and fingerprints" (611 F Supp, at 490 [emphasis supplied]; see, id., at 488). Significantly, where statutory rights implicating the Fourth Amendment guarantees have been violated, this Court has not hesitated to apply the exclusionary rule to remedy violations (see, People v Taylor, 73 N.Y.2d 683, supra; People v Gallina, 66 N.Y.2d 52, supra).
The majority's analysis is also lacking because it fails to consider the substantiality of the harm suffered by individuals whose rights under CPL 160.50 have been disregarded. Where the individual's confidentiality rights are not protected, "`[o]pportunities for schooling, employment, or professional licenses may be restricted or nonexistent as a consequence of the mere fact of an arrest, even if followed by acquittal or complete exoneration'" (Matter of Henry v Looney, supra, at 762, quoting Menard v Mitchell, 430 F.2d 486, 490). Additionally, materials retained from a prior arrest may be "employed as a basis * * * to subsequently suspect, harass or otherwise penalize" the released arrestee (Matter of Henry v Looney, supra, at 762). The unauthorized retention and use of arrest photographs and fingerprints is particularly pernicious because, as occurred here, they form the basis of a new criminal investigation, subjecting the individual to the attendant humiliation and discomfort. Thus, there can be no doubt that violations of the statutory command result in impairments of constitutional rights that are both real and substantial.
Finally, the majority's discussion of the problem presented here is incomplete because it fails to recognize the exclusionary rule as an important means of enforcing CPL 160.50's mandate. The central function of the exclusionary rule is to provide a deterrent to official misconduct. To the extent that the majority has overlooked this critical purpose and instead *726 focused on the impact of the CPL 160.50 violation on the reliability of the identification, the fairness of the trial and the defendant's guilt or innocence, its analysis is, quite simply, irrelevant. Similarly, the majority's reliance on the availability of a civil remedy under article 15 of the Executive Law is, at best, puzzling, since the rights conferred by the relevant provisions of that article are restricted to the improper use of sealed criminal records, photographs and fingerprints "in connection with the licensing, employment or providing of credit or insurance" (Executive Law § 296 [16]). The Executive Law's civil remedy is thus of no value where remedy is most needed, i.e., the misuse of sealed records for law enforcement purposes.
The majority's apparent lack of concern for the deterrent function of the exclusionary rule is particularly disturbing in this context because of the patent and pressing need to stimulate law enforcement authorities' compliance with the dictates of CPL 160.50. The record in this case reveals that the Onondaga County Sheriff's Department had taken no steps to ensure that the photographs it possessed and displayed for identification purposes were not from sealed files. Similarly, the court in Anderson v City of New York (611 F Supp 481, 492, supra), expressed skepticism about the New York City Police Department's vigilance in ensuring compliance with CPL 160.50 in view of the facts that two sealing orders in the defendant's case had been ignored, the codefendant's photographs had not been returned despite the existence of a sealing order and the parties had cited "numerous [other] cases involving unreturned photographs." The widespread disregard of the statute is also reflected in a recent study conducted by the State Comptroller's office, which indicates that in a significant percentage of cases sealing orders issued by courts were not included in the individual "criminal history" database maintained by the Division of Criminal Justice Services, which provides information, including fingerprints, to law enforcement agencies State-wide (Off of St Comp, Performance Audit Report 89-S-16, Division of Criminal Justice Services: Criminal Records, at 4-7 [1991]). An equally shocking conclusion was drawn in a recent legislative document, which asserts: "In reality, the majority of cases that are supposed to be sealed pursuant to the current statute are not. Often, the court fails to enter a sealing order * * * Furthermore, *727 even when a judge specifically orders an arrest sealed, the proper paperwork may not reach the Division of Criminal Justice Services so that the record will in fact be sealed" (Assembly Mem in Support of A 2522, at 1-2 [1991]).
In short, whether the cause is deliberate disobedience or careless disregard of the statutory command, there is ample ground to be concerned about a State-wide pattern of "inattention to [CPL 160.50's] requirements" that can only be addressed through the application of the exclusionary rule (see, Matter of Emilio M., supra, at 177). Indeed, the disincentive to disobedience that the exclusionary rule provides is needed to counterbalance the built-in incentive that law enforcement authorities have to disregard the statute and retain arrestees' photographs as a means of simplifying their investigative process. Regrettably, there is nothing in the majority's perfunctory treatment of this important issue that suggests a possible alternative approach to improving law enforcement's compliance with CPL 160.50. To the contrary, I fear that the majority's dismissal of the infraction here as a mere "technical" violation not warranting suppression (majority opn, at 718) may serve as a signal to some that they may continue to violate these important statutory guarantees with impunity.
For all of these reasons, I would apply the suppression rule here. Application of the exclusionary rule is particularly meaningful in this context because it would implement the legislative goal of "restor[ing the accused] * * * to the status he occupied before the arrest and prosecution" (CPL 160.60 [companion provision]).
Suppression of the wrongfully obtained photographic identification would necessarily lead to reversal and retrial in this case, since there was no Wade hearing inquiry into the "independent source" for Hagenbach's in-court identification testimony and, consequently, the admission of that testimony must be deemed reversible error (see, People v Burts, 78 N.Y.2d 20). Moreover, the error cannot be dismissed as harmless because, although there were several witnesses to the melee on the preceding evening, Hagenbach was the only witness to identify defendant as a participant in the March 30th assault. Inasmuch as the assailant's identity was very much in issue, Hagenbach's identification testimony was crucial and the error in its admission requires reversal.
Order affirmed.
NOTES
[1] CPL 160.50 provides, in pertinent part:

"Upon the termination of a criminal action or proceeding against a person in favor of such person * * * unless the district attorney * * * demonstrates to the satisfaction of the court that the interests of justice require otherwise * * * the court wherein such criminal action or proceeding was terminated shall enter an order, which shall immediately be served by the clerk of the court upon the commissioner of the division of criminal justice services and upon the heads of all police departments and other law enforcement agencies having copies thereof, directing that:
"(a) every photograph of such person and photographic plate or proof, and all palmprints and fingerprints taken or made of such person pursuant to the provisions of this article * * * shall forthwith be returned to such person, or to the attorney who represented him at the time of the termination of the action or proceeding".
[2] Our holding here is consistent with the underlying premise of the Dondi decision. In Dondi, we implicitly held that a violation of CPL 160.50, standing alone, was insufficient to require the drastic remedy of dismissal of the complaint  a remedy which would preclude further prosecution. Similarly, in the context of a criminal prosecution, imposition of the severe sanction of suppression often results in an inability to successfully proceed with prosecution of the defendant.
[*] Hagenbach knew Thompson fairly well, but was not acquainted with defendant, although he believed he had seen him once in a bar.